IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

BELINDA G. McKAY

      Plaintiff,

v.                                         Case No.: 3:12-cv-01601

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

      Defendant.

PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable Robert C. Chambers,  United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10, 11).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **recommends** that Plaintiff's

motion be **denied,** that the Commissioner's motion be **granted**, and that this case be **dismissed**, with prejudice, and removed from the docket of the Court.

## I.     Procedural History

Plaintiff, Belinda G. McKay ("Claimant"), filed the instant applications for SSI and DIB on April 3, 2008, alleging a disability onset date of July 1, 2004. (Tr. at 176, 184).[1] The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 101, 106, 111, 114). Claimant filed a request for an administrative hearing, which was held on June 29, 2010 before the Honorable Andrew J. Chwalibog, Administrative Law Judge ("ALJ"). (Tr. at 30-52). By written decision dated October 19, 2010, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 8-22). The ALJ's decision became the final decision of the Commissioner on March 15, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1–3). Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 7, 8, 10, 11). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 50 years old at the time she filed the instant applications for benefits and 52 years old at the time of her administrative hearing. (Tr. at 35, 176).

---

[1] Plaintiff filed prior applications for DIB and SSI on November 29, 2004 and May 17, 2005, respectively, alleging a disability onset date of July 12, 2004. (Tr. at 60). Both applications were denied after review by an ALJ in a decision dated September 7, 2007. (Tr. at 60-75). Because the prior ALJ decision remains in full effect, the period at issue in the instant application begins September 8, 2007. *See Lance v. Astrue*, 2012 WL 3716850, at *1 n.1 (D.S.C. Aug. 28, 2012); *Robinson v. Astrue*, 2010 WL 1872850, at *1 n.1 (M.D.N.C. May 6, 2010).

She attended school to the tenth grade and subsequently received a GED. (Tr. at 36). Claimant communicates in English. (Tr. at 201). Her prior employment history includes work as a sales associate and cashier in retail establishments. (Tr. at 203). At the time of the administrative hearing, Claimant was working 15-20 hours per week as a cashier at a fast food restaurant. (Tr. at 37).

### III.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a, 416.920a. Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation

resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2), 416.920a(e)(2).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2009. (Tr. at 11,

Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that although Claimant had worked part time following the alleged onset date, her work did not rise to the level of substantial gainful activity. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: "depressive disorder, cognitive disorder and traumatic brain injury (trouble with concentration and memory), obesity, diabetes mellitus and a back injury." (Tr. at 11-12, Finding No. 3). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 12-14, Finding No. 4). Accordingly, under the fourth inquiry, the ALJ assessed Claimant's RFC, finding that Claimant had:

> the residual functional capacity to perform light work and can occasionally climb ramps and stairs, occasionally balance, stoop, or kneel. The claimant can never climb ladders or scaffolds and can never crouch or crawl. The claimant must avoid concentrated exposure to cold, wetness, humidity and vibrations. The claimant should avoid moderate exposure to heat, fumes, dust, gas, odors and pulmonary irritants as well as hazards. The claimant is further restricted to routine one and two step tasks in a low stress setting.

(Tr. at 14-20, Finding No. 5). Accordingly, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 20, Finding No. 6). The ALJ then reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 20-21, Finding Nos. 7–10). The ALJ considered that (1) Claimant was born in 1957 and was defined as an individual closely approaching advanced age; (2) she had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because Claimant's past relevant work was unskilled. (Tr.

at 20, Finding Nos. 7–9). Given these factors and Claimant's RFC based on all of her impairments, the ALJ relied upon the testimony of a vocational expert in finding that Claimant could perform jobs at the light and sedentary exertional levels, which were available in significant numbers in the national economy. (Tr. at 21, Finding No. 10). At the light exertional level, the ALJ found that Claimant was able to perform the jobs of price marker, assembler, and mail clerk (non-governmental). (Tr. at 21). At the sedentary level, the ALJ found that Claimant could work as a router clerk and a grader sorter. (*Id.*). Therefore, the ALJ concluded that Claimant was not disabled and, thus, was not entitled to benefits. (Tr. at 21, Finding No. 11). Additionally, the ALJ found that Claimant's past history of substance abuse was not a contributing factor material to the determination of disability. (Tr. at 21-22, Finding No. 12).

## IV.   Claimant's Challenges to the Commissioner's Decision

Claimant raises two challenges to the Commissioner's decision. First, Claimant asserts that the ALJ ignored certain medical source findings and opinions. (ECF No. 10 at 6-9). Specifically, Claimant alleges that the ALJ ignored the findings of Dr. Drew Apgar, an agency consultant, with respect to carpal tunnel syndrome and range of motion in Claimant's hips and knees, and misinterpreted the findings of Dr. Craig Morgan, a treating physician, with respect to Claimant's peripheral vision. (*Id.* at 6-9). Second, Claimant contends that the ALJ failed to conduct a proper analysis pursuant to *Albright v. Comm'r*, 174 F.3d 473 (4th Cir. 1999). (*Id.* at 9-10). Claimant argues that the current ALJ decision should have expressly addressed the findings contained in the earlier ALJ decision denying her prior application for benefits. (*Id.* at 10).

## V.     Relevant Medical History

### A. Dr. Apgar's Physical Evaluation

On July 15, 2008, Dr. Drew C. Apgar, J.D., D.O., F.C.L.M., conducted a full physical evaluation of Claimant on behalf of the West Virginia state agency. (Tr. at 341-54). During the evaluation, Dr. Apgar interviewed Claimant regarding her medical history and present illnesses; conducted a full physical examination of Claimant's systems, including her muscles and joints; and summarized his findings.

During the interview, Claimant claimed to suffer from carpal tunnel syndrome. (Tr. at 342). She reported "joint pain, neck pain, back pain, muscle pain, and weakness" but denied "swollen joints, tendon strain, ligamentous strain, and muscle spasm." (Tr. at 345).

During the physical examination, Dr. Apgar assessed Claimant's speech, skin, HEENT, heart, lungs, abdomen, upper and lower extremities, back, and neurologic function. (Tr. at 345-51). Regarding Claimant's hands, Dr. Apgar observed that her "[d]ominant hand is right. Manipulation bilaterally is intact. Pinch is intact. Grasp is equal and diminished." (Tr. at 349). In an attached Data Sheet, Dr. Apgar documented that Claimant's grasp was abnormal, but her manipulation, pinch, and fine coordination were normal bilaterally. (Tr. at 355). Dr. Apgar also found that Claimant's gait was weight-bearing, steady, and deliberate; it was not antalgic; and she did not require any appliances or other assistance to walk. (Tr. at 350). However, in the attached Data Sheet, Dr. Apgar noted that Claimant's range of motion on hip flexion was restricted at 90 degrees on the right and 95 degrees on the left, and her range of motion on knee flexion was restricted at 90 degrees on the right and 100 degrees on the left. (Tr. at 358).

8

Although Dr. Apgar included "history of carpal tunnel syndrome" in his diagnostic impression, (Tr. at 352), in the summary of his evaluation, he stated that Claimant's "[g]rasp is intact bilaterally. Dominant hand is right. Fine coordination, pinch, and manipulation are intact bilaterally. Claimant is able to perform rapid alternating hand movements without difficulty. Stereognosis[2] is present." (Tr. at 353). Dr. Apgar reiterated his observations regarding Claimant's hip and knee flexion, but added that "[n]o joint abnormality is observed or palpated. No redness, heat, swelling effusion, thickening, infection, deformity, no instability. Gait is steady, deliberate and weight-bearing. It is not antalgic. It is not wide-based. No cane or other device is required for ambulation." (*Id.*). Based upon these and other objective findings, Dr. Apgar opined that Claimant "would have no difficulty with standing, sitting, hearing and speaking. There may [be] some difficulties with walking, lifting, carrying, pushing, pulling, handling objects with the dominant hand, and traveling." (Tr. at 354).

### B. Dr. Morgan's Eye Examination

On November 13, 2008, Craig M. Morgan, M.D., conducted an eye examination of Claimant and performed other testing to support her application for a driver's license. (Tr. at 405). Claimant reported to Dr. Morgan "an established VF [visual field] loss which occurred following a motor vehicle accident in 1986." (*Id.*). Dr. Morgan reviewed the results of Claimant's fundus photography, fluorescein report, and optical coherence tomography, which were largely unremarkable. (*Id.*). Regarding Claimant's visual field, Dr. Morgan observed that it was "somewhat

---

[2] The perception of the form of an object by touch. *The American Heritage® Medical Dictionary* Copyright © 2007, 2004 by Houghton Mifflin Company

incongruous, not totally congruous, primarily inferior right quadrantopsia." (*Id.*). Based upon these objective findings, it was Dr. Morgan's diagnostic impression that Clamant suffered from diabetes, without significant retinopathy, and specifically no retinal edema or proliferative disease. (*Id.*). Dr. Morgan noted that Claimant's cerebral VF loss "evidently is chronic, well known, documented, and persistent," but observed that "[u]nfortunately there is nothing that can be done to correct the peripheral visual field deficit which is cerebral in nature." (*Id.*). Regarding Claimant's desire to obtain a driver's license, Dr. Morgan opined "I personally don't think this visual field loss should keep her from driving," but acknowledged that he is "not an expert on the legal requirements for peripheral visual field and driving." (Tr. at 405). Dr. Morgan concluded that "[i]t may well be that with the visual field loss that she has that they will not allow her to have a driver's license. This is out of my hands and I have nothing to do with this. If she failed the VF test at the DMV and they refused to let her have a driver's license, then unfortunate *[sic]* this is the way it is. There isn't anything to do medically to correct her VF." (*Id.*).

## VI.  **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir.

1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). Thus, the decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock,* 483 F.2d at 775.

## VII.  **Analysis**

### A. *Findings of the State Agency Physician*

Claimant argues that the ALJ "ignored certain findings made by the examining state agency physician" and failed to comprehend the extent of the visual limitations described by Dr. Morgan. (ECF No. 10 at 6, 9). Claimant disputes the ALJ's determinations that Claimant's carpal tunnel, leg pain, and loss of peripheral vision did not constitute severe impairments. (*Id.* at 6-9). She points to specific findings and opinions made by Dr. Apgar and Dr. Morgan that the ALJ purportedly ignored, or otherwise misinterpreted, in reaching his conclusions regarding the severity of her impairments. (*Id.*). Having thoroughly considered the evidence and the arguments of counsel, the undersigned rejects these challenges as lacking merit.

Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite [her] impairment(s), and

11

[her] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. *Id.* §§ 404.1527(c), 416.927(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant's alleged disability. *Id.* §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2). State agency physicians are "highly qualified" physicians who "are also experts in Social Security disability evaluation." *Id.* §§ 404.1527(e)(2), 416.927(e)(2). In the absence of a treating physician's opinion that has been afforded controlling weight, the ALJ must analyze and weigh all of the medical source opinions in the record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. *Id.* §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). When the opinions of agency experts are considered, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources." *Id.* §§ 404.1527(e)(2), 416.927(e)(2).

An impairment or combination of impairments will be considered "severe" if it "significantly limits [the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c), **and** has lasted "or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. §§ 404.1509,

404.1520(a)(4)(ii), 416.909, 416.920(a)(4)(ii); *Barnhart v. Walton*, 535 U.S. 212, 219, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002) (endorsing the SSA's requirement "that the 'impairment must be *that severe* (*i.e.*, severe enough to prevent 'substantial gainful work' for 12 months") (emphasis in original)). In contrast, an impairment is "not severe" if it "does not significantly limit [the individual's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a). When assessing the severity of an impairment, the ALJ must carefully evaluate "the medical findings that describe the impairment(s) (i.e., the objective medical evidence and any impairment-related symptoms)," and then make an informed judgment as to the effect of the impairment and symptoms on the individual's physical and mental ability to do basic work activities. SSR 96-3p, 1996 WL 374181, at *2 (S.S.A. 1996); *see also* SSR 85-28, 1985 WL 56856, at *4 (S.S.A. 1985). The ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives" when determining whether an individual's impairment is "severe" under the Social Security regulations. 20 C.F.R. §§ 404.1527(b), 416.927(b). Although the ALJ is required to *consider* all of the evidence submitted on behalf of a claimant, "[t]he ALJ is not required to *discuss* all evidence in the record." *Aytch v. Astrue*, 686 F.Supp.2d 590, 602 (E.D.N.C. 2010) (emphasis added); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining there "is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"). Indeed, "[t]o require an ALJ to refer to every physical observation recorded regarding a Social Security claimant in evaluating that claimant's ... alleged condition[s] would create an impracticable standard for agency review, and one out of keeping with the law of this circuit." *White v. Astrue*, Case No. 2:08-cv—20-FL,

2009 WL 2135081, at *4 (E.D.N.C. July 15, 2009).

### 1. Carpal Tunnel Syndrome

During the second step of the sequential evaluation, the ALJ assessed the severity of Claimant's alleged impairments, taking them one-by-one. Acknowledging that Claimant had been diagnosed with carpal tunnel syndrome by an EMG study performed in July 2010, the ALJ nonetheless found that carpal tunnel syndrome was not a severe impairment "since there is no showing that the claimant's carpal tunnel will not be resolved within the one year time limit." (Tr. at 12). Claimant argues that the ALJ erred in making this determination because he completely ignored relevant findings in Dr. Apgar's 2008 consultation report. (ECF No. 10 at 6). Claimant asserts that, contrary to the ALJ's conclusion, Dr. Apgar's record substantiates the existence of carpal tunnel syndrome for at least two years, a time period that more than satisfies the durational requirement of a severe impairment. (ECF No. 10 at 6). In Claimant's view, the ALJ either failed to review Dr. Apgar's finding or rejected them without explanation. (*Id.* at 7). In either case, the ALJ failed to abide by the Social Security regulations.

Having closely reviewed Dr. Apgar's report and Claimant's subsequent treatment records, the undersigned finds that the ALJ did not err when concluding that Claimant's carpal tunnel syndrome had not been severe long enough to meet the definition of a "severe impairment" under the regulations. Claimant simply reads too much into Dr. Apgar's notation. Dr. Apgar indeed included "history of carpal tunnel syndrome" in his diagnostic impression. (Tr. at 352). However, as the phrase "history of" indicates, Dr. Apgar did not make an independent diagnosis of carpal tunnel syndrome; instead, he simply recapitulated information provided by Claimant

14

regarding her medical history. Dr. Apgar's impression was that Claimant had chronic pain syndrome, with myofascial pain in the lumbar and cervical spine. He then explained the causes of Claimant's pain by the history that she supplied. Dr. Apgar did not provide opinions on the severity of the chronic pain syndrome and did not order objective diagnostic testing, such as an EMG, to rule in or rule out the presence of carpal tunnel syndrome.

In one section of his report, Dr. Apgar noted that Claimant's grasp was "equal and diminished," (Tr. at 349), or "abnormal" based upon dynamometer readings of 12, 12, and 16 kg in the dominant right hand, and 14, 12, and 12 kg in the left hand. (Tr. at 355).[3] However, in the summary portion of his report, Dr. Apgar concluded that Claimant's grasp was "intact bilaterally." (Tr. at 353). A review of the other recorded findings corroborates a non-severe impairment of the hands; notably, Claimant's manipulation, pinch, and fine coordination were all normal bilaterally. (Tr. at 349, 353, 355). Furthermore, Dr. Apgar observed that "Claimant is able to perform rapid alternating hand movements without difficulty" and "[s]tereognosis is present." (Tr. at 353). Although Dr. Apgar opined that "[t]here may [be] some difficulties … handling objects with the dominant hand," (Tr. at 354), these findings alone do not establish that Claimant suffered from carpal tunnel syndrome, or that it was a severe impairment at the time of the evaluation. A longitudinal review of Claimant's medical records assists with this determination. Treatment notes in evidence, which begin in September 2008, are devoid of any reference to complaints by Claimant regarding her hands, or to any related treatment, until June 28, 2010.

---

[3] The Commissioner argues that at best, Claimant's "grip strength was only mildly diminished" given that the average dominant hand grip strength for a woman the age of Claimant is only 17.5 kg. (ECF No. 11 at 16).

(Tr. at 375-77, 415-16, 419-20, 425, 431-32, 435, 437-38, 441-42). On that date, Claimant reported "increasing pain in her hands bilaterally with some numbness and tingling." (Tr. at 407-08). This complaint led to an EMG study, which resulted in the July 14, 2010 diagnosis of carpal tunnel syndrome discussed by the ALJ in his decision. (Tr. at 12, 406).

Although the ALJ did not specifically discuss Dr. Apgar's evaluation during his written assessment of the severity of Claimant's carpal tunnel syndrome, elsewhere in the decision the ALJ fully analyzed Dr. Apgar's findings, (Tr. at 19), and determined that Claimant was not significantly limited by an impairment of her hands. (Tr. at 19-20). Listing Claimant's self-described activities of daily living, the ALJ commented that Claimant "alleges that she cannot work yet she is able to dress herself, care for her hair, feed herself and use the bathroom all unassisted" as well as "use a microwave, unload and load a dishwasher," and also "does laundry, vacuums, dusts and sweeps the kitchen floor ... claimant alleges that she cannot work, yet she does in fact work part time at Wendy's." (Tr. at 19). It is apparent that the ALJ did not consider Dr. Apgar's findings to be indicative of severe impairment, both because of the limited objective findings relating to the impairment and the paucity of evidence demonstrating Claimant's diminished ability to do work activities during the relevant period. SSR 96-3p, 11996 WL 374181, at *2 (S.S.A. 1996). The first evidence of carpal tunnel syndrome constituting a severe impairment was documented on July 14, 2010, when Claimant was diagnosed with carpal tunnel syndrome, "grade 3, moderate to severe, right worse than left." (Tr. at 406). But, as the ALJ aptly observed "there is no showing that the claimant's carpal tunnel will not be resolved within the one year time limit," (Tr. at 12), particularly in light of Claimant's testimony that her doctor

16

informed her that wearing wrist braces would help her carpal tunnel syndrome. (Tr. at 41).

Even assuming that the ALJ erred in failing to explicitly assign weight to Dr. Apgar's opinion that Claimant *may* have *some* difficulty handling objects, such error was harmless because the ALJ continued the sequential evaluation process and considered the effects of Claimant's hand-related impairment at other steps in the disability assessment. See *Conard v. Comm'r*, Case No. SAG-12-2290, 2013 WL 1664370, at *2 (D. Md. Apr. 16, 2013) (finding harmless error where Claimant made threshold of severe impairment regarding other disorders and "the ALJ continued with the sequential evaluation process and considered all of the impairments, both severe and non-severe, that significantly impacted [his] ability to work"); *Cook ex rel A.C. v. Colvin*, Case No. 2:11-cv-362, 2013 WL 1288156, at *4 (E.D. Va. Mar. 1, 2013) ("The failure of an ALJ to find an impairment to be severe at Step 2, however, is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process.").

## 2. Range of Motion in Hips and Knees

Claimant argues that the "ALJ failed to explain the weight he gave" to Dr. Apgar's opinion when determining that Claimant's leg pain did not constitute a severe impairment. (ECF No. 10 at 8). Once again, at step two of the sequential evaluation, the ALJ recited Dr. Apgar's[4] findings that "the claimant's gait was steady, deliberate and weight bearing. It was not antalgic or wide based. No cane or other

---

[4] The ALJ incorrectly identified "Dr. Apgar" as "Dr. Morgan." (Tr. at 12). However, it is clear from the ALJ's detailed recitation of the medical findings that he was referring to Dr. Apgar's physical evaluation.

device was required for ambulation. Muscle strength was +5/5 in the lower extremities. The claimant denied swollen joints, tendon strain, and ligamentous strain and muscle spasm." (Tr. at 12). Based upon these findings, the ALJ determined that Claimant's leg pain was not a severe impairment. (*Id.*). Claimant however argues that the ALJ failed to address or explain his rationale for discounting Dr. Apgar's other observations that Claimant's range of motion was restricted in her hips and knees, and his opinion that "[t]here may [be] some difficulty with walking." (Tr. at 353-54). Claimant's argument is unpersuasive for reasons similar to those discussed above.

First, it is clear that the ALJ did not simply ignore Dr. Apgar's findings of restricted range of motion in Claimant's hips and knees. Although the ALJ did not explicitly reference these findings in his assessment of severity, he did note elsewhere that Dr. Apgar had observed "restriction seen in flexion at 90 degrees on the right and 95 degrees on the left," and "restriction seen in flexion on the right at 90 degrees and 100 degrees on the left," in Claimant's hips and knees, respectively. (Tr. at 18, 353). Claimant's contention that the ALJ erred in failing to explicitly identify the body parts that were restricted in range of motion is entirely meritless, as it is clear from the context that the ALJ was reviewing Dr. Apgar's findings in the same order as the evaluation itself, and thus referred to Claimant's hips and knees. (*Id.*).

Second, despite Dr. Apgar's opinion that Claimant may have some difficulty walking, the ALJ's determination that Claimant's leg pain was not a severe impairment is supported by substantial evidence on the record given the remainder of Dr. Apgar's observations that:

No joint abnormality is observed or palpated. No redness, heat,

18

> swelling, effusion, thickening, infection, deformity, or instability. Gait is steady, deliberate and weight-bearing. It is not antalgic. It is not wide-based. No cane or other device is required for ambulation.

(Tr. at 353). The ALJ accorded "great weight" to the consultative agency RFC opinions of Dr. Lauderman, D.O. and Dr. Boukhemis, M.D., (Tr. at 20), who both opined that Claimant could "stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday," (Tr. at 361, 385), based upon their respective reviews of Dr. Apgar's physical examination. (Tr. at 367, 391). Thus, it appears that rather than ignoring Dr. Apgar's opinion that Claimant *may* have *some* difficulty with walking, the ALJ determined that Dr. Apgar's other observations satisfactorily demonstrated that any potential impairment from Claimant's limited range of motion was non-severe.

Moreover, as with Claimant's assignment of error regarding carpal tunnel syndrome, even if the ALJ erred in failing to explicitly state the weight given to certain observations in Dr. Apgar's evaluation, such error was harmless. *See Conard*, 2013 WL 1664370, at *2; *Cook ex rel A.C.*, 2013 WL 1288156, at *4. Although the ALJ declined to find Claimant's leg pain to be a severe impairment, he nevertheless considered her leg pain, along with all other impairments, later in the sequential evaluation. (Tr. at 18). Indeed, the ALJ limited Claimant to "light work" and found that she could only "occasionally climb ramps and stairs," but "never climb ladders or scaffolds," and could "occasionally balance, stoop or kneel" but "never crouch or crawl," consistent with agency RFC opinions and Dr. Apgar's examination. (Tr. at 14, 20).

### 3. Peripheral Vision

Claimant argues that the ALJ erred in relying on Dr. Morgan's eye

examination to determine that her lack of peripheral vision was not a severe impairment. (ECF No. 10 at 8-9). In essence, Claimant objects to the weight the ALJ accorded this evaluation in light of Dr. Morgan's caveat that he is "not an expert on the legal requirements for peripheral visual field and driving," and that "[i]f [Claimant] failed the VF test at the DMV and they refused to let her have a driver's license, then unfortunately this is the way it is." (*Id.* at 8). Claimant insists that "the history she gave to Dr. Baxter when seeking a consult with a vision specialist," namely that her driving license has been revoked twice for loss of peripheral vision, demonstrates severe impairment. (*Id.* at 8-9). This argument is unavailing, however, when considering the applicable standard of review to be used by this Court. The Court does not examine the record in order to "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the ALJ;" rather, the Court assesses the record as a whole to ensure that substantial evidence supports the Commissioner's final determination. *Parsons v. Astrue*, 484 Fed. Appx. 840, 840 (4th Cir. 2012).

In reviewing the ALJ's decision, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (internal quotation marks omitted). Here, the ALJ carefully considered Dr. Morgan's objective findings, as well as his opinion "that the visual field loss should not keep her from driving." (Tr. at 11). Although Claimant objects to Dr. Morgan's evaluation based upon his acknowledgement that he is not an expert in the legal requirements for driving, Claimant does not dispute the objective findings contained in Dr. Morgan's November 13, 2008 eye examination, nor does she offer

other objective medical evidence relating to her field of vision. Indeed, as Dr. Morgan emphasized, the DMV driving requirements are a separate issue from the medical findings and diagnoses relating to Claimant's visual field loss. (Tr. at 405). Had Claimant introduced into evidence the DMV testing results or other objective findings, the ALJ certainly would have reviewed this information. Claimant's assertion that her license had been revoked twice due to loss of peripheral vision, without more, does not suffice to establish severe impairment; particularly, as Claimant testified at the administrative hearing that she had obtained a driver's license since Dr. Morgan's evaluation. (Tr. at 36).

The ALJ provided a thorough overview of Claimant's physical evaluations, basing his determinations of severity on substantial objective evidence on the record. Although Claimant argues that the ALJ "ignored" certain findings and opinions contained in the evaluations, the record reflects that the ALJ instead carefully reviewed the medical evidence, and appropriately weighed the opinions of the evaluators. Therefore, the undersigned **FINDS** that the ALJ adequately considered and weighed the medical findings and opinions in determining the severity of Claimant's impairments.

### B. Albright Analysis

Claimant argues that "[t]he ALJ did not address the findings of the prior ALJ decision" as required by *Albright v. Comm'r*, 174 F.3d 473 (4th Cir. 1999), and the SSA's Acquiescence Ruling, AR 00-1(4), 2000 WL 43774 (S.S.A. Jan. 12, 2000). In *Albright*, the Fourth Circuit clarified its holding in a prior case, *Lively v. Secretary of HHS*, regarding the effect of prior disability findings on adjudication of a subsequent disability claim. *Albright*, 174 F.3d at 477. The SSA subsequently issued AR 00-1(4),

to provide guidance on the *Lively/Albright* line of cases.

In *Lively v. Secretary of HHS*, the claimant's first application for benefits was denied after he was found capable of light work. 820 F.2d 1391, 1392 (4th Cir. 1987). Two weeks later, the claimant turned 55 years old, the age at which a light work limitation would have qualified him for benefits, and he filed a second application for benefits. *Id.* In the subsequent decision, however, the ALJ found that the claimant was capable of work at any exertional level. *Id.* The Fourth Circuit reversed the ALJ's decision, holding that "[i]t is utterly inconceivable that his condition had so improved in two weeks as to enable him to perform medium work. Principles of finality and fundamental fairness ... indicate that the Secretary must shoulder the burden of demonstrating that the claimant's condition had improved sufficiently to indicate that the claimant was capable of performing medium work." *Id.* The Commissioner subsequently interpreted the Fourth Circuit's decision in *Lively* to require that "[w]hen adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision ... on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding." AR 94-2(4), 1994 WL 321954 (S.S.A. Jul. 7, 1994) (quoted in *Albright*, 174 F.3d at 474-75).

However, in *Albright*, the Fourth Circuit rejected the Commissioner's interpretation of *Lively*, because it erected an "absolute bar to an award of benefits, unless [C]laimant can produce new and material evidence that his impairment increased in severity by [the date] when his insured status expired." *Albright*, 174 F.3d at 475. Rather, the Fourth Circuit read *Lively* "as a practical illustration of the

substantial evidence rule," in that "the finding of a qualified and disinterested tribunal [as to that Claimant's RFC] was such an important and probative fact as to render the subsequent finding to the contrary unsupported by substantial evidence," where the subsequent application related to a disability onset date commencing two weeks after the Claimant's initial denial of disability benefits. *Id.* at 477-78.

Following the Fourth Circuit's decision in *Albright*, the Commissioner issued AR 00-1(4),[5] which instructs that, "[w]hen adjudicating a subsequent disability claim arising under the same or a different title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances." AR 00-1(4), at *4. Relevant factors for determining the weight to give a prior finding include: "(1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim." *Id.* Furthermore, the Ruling instructs the ALJ to "give greater weight to such a prior finding when the previously adjudicated period is close in time to the period being adjudicated in the subsequent claim, e.g., a few weeks" and "give less weight to such a prior finding as the proximity of the period

---

[5] AR 00-1(4) only applies to "disability findings in cases involving claimants who reside in Maryland, North Carolina, South Carolina, Virginia or West Virginia at the time of the determination or decision on the subsequent claim." AR 00-1(4), at *4.

previously adjudicated to the period being adjudicated in the subsequent claim becomes more remote, e.g., where the relevant time period exceeds three years." *Id.* Ultimately, the ALJ must "consider all relevant facts and circumstances on a case-by-case basis." *Id.*

Here, Claimant's prior DIB and SSI applications alleged a disability onset date of July 12, 2004. (Tr. at 60). These claims were denied in a September 7, 2007 written decision by ALJ Richard Vogel, which was subsequently upheld by the Commissioner and the United States District Court for the District of South Carolina.[6] (Tr. at 60-75). Claimant protectively filed the instant DIB and SSI applications on April 3, 2008, again alleging the onset of disability in July 2004. At the administrative hearing, ALJ Chwalibog discussed with Claimant the effect of the September 7, 2007 decision by ALJ Vogel, indicating that to account for that decision, Claimant's disability onset date would be amended to September 8, 2007, one day after ALJ Vogel's denial of benefits. (Tr. at 32-33). In his written decision, ALJ Chwalibog again noted that Claimant's prior applications had been denied in September 2007, and ALJ's Vogel's decision was made part of the record. (Tr. at 8). Other than these references to the decision, ALJ Chwalibog did not discuss in his written decision ALJ Vogel's prior findings or provide an explicit analysis of the factors outlined in AR 00-1(4). Claimant contends that the absence of a written

---

[6] In the prior decision dated September 7, 2007, ALJ Vogel determined that Claimant's "adjustment disorder, borderline personality disorder, borderline intellectual functioning and lower extremity edema" were severe impairments, while her "diabetes, carpal tunnel syndrome, a back disorder, history of asthma, a brain injury, poor vision and obesity" were not severe. (Tr. at 62-63). ALJ Vogel subsequently determined that Claimant had the "residual functional capacity to perform light work activity with a sit/stand option at will and no more than frequent fingering with the non-dominant hand. Due to the claimant's mental impairments she is further limited to work activity with simple, repetitive one-two step tasks in a low stress environment with only occasional decision-making and occasional changes in the work setting and only occasional exposure to the general public." (Tr. at 66-73).

analysis of the factors constitutes a failure by ALJ Chwalibog to abide by AR 00-1(4) and, consequently, justifies remand of the decision.

In response, the Commissioner opposes remand, arguing that the ALJ did in fact consider the previous RFC finding at the administrative hearing when he posed hypothetical questions to the vocational expert that included the restrictions from the ALJ Vogel's RFC assessment. (ECF No. 11 at 19). The Commissioner contends that "the RFC in this case is not inconsistent with the prior RFC and, even assuming that Plaintiff were limited as she was in the prior application, she could nevertheless perform the light work positions," which exist in sufficient numbers in the national and regional economy. (*Id.* at 19-20).

Notwithstanding the ALJ's failure to explain the weight he gave to the prior decision, the undersigned agrees that remand is not appropriate in this case. AR 00-1(4) requires the ALJ to consider and weigh the prior decision as evidence, but does not impose a burden on the ALJ to explicitly state the weight he assigned to this evidence. *See Harris v. Astrue*, Case No. 2:12-cv-45, 2013 WL 1187151, at *8 (N.D.W.V. Mar. 21, 2013) ("The plaintiff argues that, even if the ALJ did consider the prior ruling and findings, he did not explicitly state the weight assigned to this evidence. However, AR 00-1(4) does not impose such a burden upon the ALJ; AR 00-1(4) merely states that the ALJ shall consider and weigh the prior ruling as evidence in reaching his decision in the second claim."). Even if ALJ Chwalibog erred by not providing an analysis of the weight he afforded to the prior decision, the undersigned finds the error to be harmless because ALJ Chwalibog clearly considered and incorporated ALJ Vogel's findings in the disability assessment. *See Melvin v. Astrue,* 602 F.Supp.2d 694, 704-05 (E.D.N.C. 2009). Moreover, the RFC assessment by ALJ

Chwalibog was not inconsistent with the findings of ALJ Vogel.

Courts, including those in this circuit, routinely apply a harmless error analysis to administrative decisions that do not fully comport with the procedural requirements of the agency's regulations, but for which remand "would be merely a waste of time and money." *Jenkins v. Astrue,* Case No. 08-4078-JAR, 2009 WL 1010870 at *4 (D. Kan. Apr. 14, 2009) (citing *Kerner v. Celebrezze,* 340 F.2d 736, 740 (2nd Cir. 1965)); *See Morgan v. Barnhart,* 142 Fed. Appx. 716, 722–23 (4th Cir. 2005) (unpublished); *Bishop v. Barnhart,* 78 Fed. Appx. 265, 268 (4th Cir. 2003) (unpublished). In general, remand of a procedurally deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission,* 721 F.2d 1054, 1056 (6th Cir. 1983). "[P]rocedural improprieties alleged by [a claimant] will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988).

During the administrative hearing, the ALJ asked several hypothetical questions regarding available jobs for someone of Claimant's age, education, past training and work experience. (Tr. at 49-50). The ALJ first instructed the vocational expert to consider an individual who was limited to "light exertional work, only occasionally climb a ramp or stairs, occasionally balance stoop or kneel, never claim a ladder or scaffold, never crouch or crawl, need to avoid concentrated exposure to cold, wetness, humidity and vibration, avoid even moderate exposure to heat, fumes, odors, dust, gas and pulmonary irritant as well as hazards, and further restrict the

individual to routine one and two step tasks in a low stress setting." (*Id.*). The vocational expert testified that such a claimant could work at the light exertional level as a price marker (110,000 national jobs, 7,500 regional jobs) or an assembler (78,000 national jobs, 5,000 regional jobs), and could work at the sedentary exertional level as a routing clerk (62,000 national jobs, 4,000 regional jobs) or a grater, sorter (48,000 national jobs, 4,5000 regional jobs). (Tr. at 50). The ALJ then asked, "If we were to add to that a sit, stand option and only frequent fingering with the non-dominant hand. That's further in lieu of the mental restriction I gave you, that she'd be limited to simple repetitive one and two step tasks in a low stress environment with only occasional decision making and occasional changes in the work setting and only occasional exposure to the general public. How would that affect jobs?" (*Id.*). Thus, the ALJ's second hypothetical question incorporated in its entirety the RFC assessment of ALJ Vogel. As a result, the vocational expert was asked to presume that Claimant had all of the limitations and restrictions identified by ALJ Vogel, as well as the additional restrictions and limitations described by ALJ Chwalibog. Taking **all** of these into consideration, the vocational expert testified that this RFC would remove the assembler job from the list previously provided, but, in its place, Claimant would be able to work as a non-governmental mail clerk (66,000 national jobs, 3,500 regional jobs). (Tr. at 51).

Therefore, the undersigned concludes that the ALJ complied with AR 00-1(4) by considering and implicitly attributing full weight to the prior RFC finding of ALJ Vogel. After reviewing the record in its entirety, the undersigned is convinced that the ALJ's final decision is supported by substantial evidence and complied with the applicable Social Security regulations and rulings.

27

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's motion for a remand as articulated in her Brief in Support of Judgment on the Pleadings, (ECF No. 10), **GRANT** Defendant's Motion for Judgment on the Pleadings, (ECF No. 11), and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** May 28, 2013.

Cheryl A. Eifert
United States Magistrate Judge